IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Capital BlueCross,<br><br>  Plaintiff,<br><br>vs.<br><br>Atlantic Specialty Insurance Company,<br><br>  Defendant. | Civil Action No.: 1:20-cv-02299-CCC<br><br><br>(Hon. Christopher C. Conner) |

## AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY OF PLAINTIFF, CAPITAL BLUECROSS

Plaintiff Capital BlueCross ("Capital BlueCross"), by its counsel, asserts the following claims against defendant Atlantic Specialty Insurance Company ("Atlantic Specialty") and alleges in its Amended Complaint:

### NATURE OF ACTION

1.     Capital BlueCross, a central Pennsylvania employer of over 2,000 people, brings this action against Atlantic Specialty, a New York insurance company, based on its bad faith conduct in assessing its coverage obligations to Capital BlueCross related to a protracted and cumbersome multi-district litigation Capital BlueCross has been subjected to in the Northern District of Alabama. Atlantic Specialty alone has refused to participate in the defense and resolution of

this Alabama litigation, despite the cooperation of every other insurer of Capital BlueCross.  Rather than join in the effort to mitigate the burden of the Alabama litigation, Atlantic Specialty has engaged in purposefully dilatory and obstructive bad faith conduct in an effort to frustrate Capital BlueCross's efforts to obtain the benefits of its insurance policy.

2.     Plaintiff brings this insurance coverage action against Atlantic Specialty seeking a declaration, pursuant to 28 *U.S.C.* § 2201, that Atlantic Specialty must provide coverage for defense and indemnity costs arising from a multidistrict litigation pending against Capital BlueCross in the United States District Court for the Northern District of Alabama.  Capital BlueCross also seeks compensatory, consequential and punitive damages arising from Atlantic Specialty's breach of its insurance policy, anticipatory breach of its insurance policy, breach of the implied duty of good faith and fair dealing, and bad faith claims handling.

**PARTIES**

3.     Plaintiff Capital BlueCross is incorporated under the laws of the Commonwealth of Pennsylvania and maintains its principal place of business in Harrisburg, Pennsylvania.

4.     Defendant Atlantic Specialty, upon information and belief, is incorporated under the laws of the State of New York and maintains its principal

place of business at 605 Highway 169 North, Suite 800, Plymouth, Minnesota 55441.

## JURISDICTION AND VENUE

5.    This Court possesses subject matter jurisdiction over this action pursuant to 28 *U.S.C.* §1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because this action involves a dispute between citizens of different states.

6.    Venue properly rests in this Court pursuant to 28 *U.S.C.* §1391.

7.    This action is commenced, in part, pursuant to the Declaratory Judgment Act, 28 *U.S.C.* § 2201, *et seq.*

## FACTUAL ALLEGATIONS

**I.    The Blue Cross Blue Shield Plans**

8.    More than 80 years ago, the first Blue Cross Plans began with local hospitals, while Blue Shield Plans were developed in conjunction with medical societies.

9.    Blue Cross and Blue Shield Plans provided subscribers with indemnity coverage for healthcare services, alleviating economic fears about medical events, and gave hospitals and doctors assurances that they would be paid.

10.    The Blue Cross and Blue Shield organizations merged in 1982 to form the Blue Cross and Blue Shield Association ("Association").

ME1 43920603v.1

11.     The Blue system now consists of the Association and independent licensees that operate under the familiar Blue Cross and Blue Shield trademarks in the United States (the "Blue Plans").

12.     Capital BlueCross, or Capital BlueCross's predecessor companies, began delivering a personalized healthcare experience to its customers in central Pennsylvania nearly 80 years ago.

13.     Today, Capital BlueCross is headquartered in Harrisburg, Pennsylvania and currently provides insurance to more than 700,000 people living in 21 counties in Central Pennsylvania and the Lehigh Valley.

14.     Capital BlueCross also supports its goal of improving the well-being of its Pennsylvania members and their communities by offering various services to its members through three health and wellness centers.

15.     Capital BlueCross also invests in hundreds of organizations across its 21-county service area through its community investment program – in health and human services to the arts, education, and workforce development.

16.     In addition to serving its members, Capital BlueCross also employs over 2,000 people in the Commonwealth of Pennsylvania and was awarded Best Places to Work in Pennsylvania in 2018, 2019, and 2020.

ME1 43920603v.1

## II.     Nature of the Underlying Action

17.     Beginning in 2012, numerous class actions were filed against the Blue Plans and the Association alleging violations of antitrust laws.  Capital BlueCross was added as a defendant on July 1, 2013.

18.     In December 2012, the Judicial Panel on Multidistrict Litigation consolidated and transferred more than 40 of these actions to the United States District Court for the Northern District of Alabama, creating the MDL litigation styled *In Re: Blue Cross Blue Shield Antitrust Litigation*, Master File No. 2:13-cv-20000-RDP (the "Alabama Antitrust Litigation").

19.      The Alabama Antitrust Litigation is separated into two tracks: (1) the "Subscriber" track, and (2) the "Provider" track.

20.     The Subscriber track includes as plaintiffs those individuals who are covered under a health insurance plan issued by a Blue Cross Blue Shield Company.

21.     The Provider track includes as plaintiffs providers of medical services, including, among others, medical doctors, osteopaths, chiropractors, hospitals, ambulatory surgical centers, urgent care centers, etc.  Providers, in essence, can include any individuals or organizations that provide health care services.

22.     In November 2020, the Subscribers filed a Fourth Amended Consolidated Class Action Complaint (the "Subscriber Consolidated Fourth

ME1 43920603v.1

Amended Complaint") against the Blue Plans, including Capital BlueCross, and the Association.  A copy of the Subscriber Consolidated Fourth Amended Complaint is attached hereto as Exhibit A.

23.    In April 2017, the Providers filed a Consolidated Fourth Amended Complaint (the "Provider Consolidated Fourth Amended Complaint") against the Blue Plans, including Capital BlueCross, and the Association.  A copy of the Provider Consolidated Fourth Amended Complaint is attached hereto as Exhibit B.

24.    The Subscribers and Providers allege, among other things, that the Blue Plans, including Capital BlueCross, violated federal antitrust laws and engaged in price fixing and/or anticompetitive activities.

25.    The Alabama Antitrust Litigation is a massive multi-district litigation that has been pending for over eight years, involves over 3,000 docket entries, and has involved the parties in over six years of mediation.

26.    The Subscriber plaintiffs, without factoring in any damages claimed by the Provider plaintiffs, estimated their monetary damages to be between $18.6 billion and $36.1 billion based on the claims of tens of millions of members. Alabama Antitrust Litigation, Subscriber Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Proposed Class Settlement, ECF # 2610-1 at 41 and 44.

ME1 43920603v.1

## III.    The Atlantic Insurance Policy

27.    From June 30, 2013, through June 30, 2014, Capital BlueCross was covered under Atlantic Specialty's Managed Care Errors and Omissions Follow Form Excess Policy number MCX-1808-13, effective June 30, 2013 through June 30, 2014 ("Policy").  A copy of the Policy is attached hereto as Exhibit C.

28.    The Policy was issued to Capital BlueCross at its headquarters in Harrisburg, Pennsylvania.

29.    The limit of liability of the Policy is $5,000,000 per claim and in the aggregate.  The Policy is part of a comprehensive insurance program designed to protect Capital BlueCross from financial harm that provides both errors and omissions liability ("E&O") coverage and directors and officers liability ("D&O") coverage as follows:

|  | E&O | D&O |
|---|---|---|
| 2nd Excess | Atlantic Specialty | ACE |
| 1st Excess | ACE American Insurance Company ("ACE") | National Union Fire Insurance Company of Pittsburgh, PA ("AIG") |
| Primary | Travelers Casualty and Surety Company of America ("Travelers") | Travelers |

30.    As a 2nd Excess layer of coverage, the Policy provides follow-form errors and omissions liability coverage to Capital BlueCross, meaning it provides

ME1 43920603v.1

coverage to Capital BlueCross when the applicable underlying primary policy provides coverage.  A copy of the primary E&O policy issued by Travelers is attached hereto as Exhibit D (the "Primary Policy").

31.    The Primary Policy requires the insurer to pay "Loss for any Claim first made during the Policy Period, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period for a Wrongful Act."  Primary Policy, § I (Ex. D).

32.    "Loss" is defined as "Defense Expenses and money which an Insured is legally obligated to pay as a result of a Claim, including settlements, judgments, compensatory damages, punitive or exemplary damages or the multiple portion of any multiplied damages award but only if insurable under the applicable law most favorable to the insurability of such fines, penalties and the multiplied portion of any multiplied damage award, prejudgment and postjudgment interest, and legal fees and expenses awarded pursuant to a court order or judgment."  Primary Policy, Managed Care Errors & Omissions Liability, § II.K, as amended by Endorsement MCO-9208 Ed. 06-11 (Ex. D).

33.    "Claim" means:

1.    a written demand for monetary damages or non-monetary relief;

2.    a civil proceeding commenced by service of a complaint or similar pleading;

3.    a criminal proceeding commenced by a filing of charges;

- 8 -

4.   a formal administrative or regulatory proceeding commenced by filing of a notice of charges, formal investigative order, service of summons, or similar document;

5.   an external arbitration, mediation, or other alternative dispute resolution proceeding if the Insured is obligated to participate in such proceeding or if the Insured agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6.   a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an Insured for a Wrongful Act committed or allegedly committed by or on behalf of an Insured or by any other person or entity for whose Wrongful Acts the Insured is legally responsible.  Primary Policy, Managed Care Errors & Omissions Liability, § II.B (Ex. D).

34.   "Wrongful Act" means, among other things, "any actual or alleged act, error or omission in the performance of, or any failure to perform, a Managed Care Activity."  Primary Policy, Managed Care Errors & Omissions Liability, § II.V (Ex. D).

35.   "Managed Care Activity" means any of the following services or activities performed by or on behalf of the Insured for or under any workers compensation plan, life insurance plan, short term or long term disability plan, or health care plan, including any consumer directed health care plan, behavioral health plan, prescription drug plan, dental plan or vision plan:

1)   Provider Selection;

2)      Utilization Review;

3)      advertising, marketing, selling, enrollment, administration or management;

4)      Claim Services;

5)      establishing or maintaining health care provider networks;

6)      reviewing, profiling or tiering quality or costs of, or providing quality assurance of, any provider of Medical Services;

7)      design or implementation of benefit plans or financial incentive plans, including pay for performance programs, that compensate providers of Medical Services;

8)      Disease Management;

9)      Health Care Plan Consulting;

10)     risk management services to any provider of Medical Services;

11)     Wellness Services;

12)     development or implementation of clinical guidelines, practice parameters or protocols;

13)     triage for payment of Medical Services.

Primary Policy, Managed Care Errors & Omissions Liability, § II.L (Ex. D).

36.     "Provider Selection means evaluating, selecting, credentialing, contracting with or performing peer review of any provider of Medical Services, but only if performed by or on behalf of the Insured." Primary Policy, Managed Care Errors & Omissions Liability, § II.O (Ex. D).

- 10 -

37.     "Utilization Review means the process of evaluating the appropriateness, necessity or cost of Medical Services for purposes of determining whether payment or coverage for such Medical Services will be authorized or paid for, including prospective review of proposed payment or coverage for Medical Services, concurrent review of ongoing Medical Services, retrospective review of already rendered Medical Services or already incurred costs, Disease Management, and case management, under any workers compensation plan, life insurance plan, short term or long term disability plan, or health care plan, including any consumer directed health care plan, behavioral health plan, prescription drug plan, dental plan or vision plan, but only if performed by or on behalf of an Insured."  Primary Policy, Managed Care Errors & Omissions Liability, § II.R (Ex. D).

38.     "Claims Services means the submission, handling, investigation, payment or adjustment of claims for benefits or coverages under any workers compensation plan, life insurance plan, short term or long term disability plan, or health care plan, including any consumer directed health care plan, behavioral health plan, prescription drug plan, dental plan or vision plan, but only if performed by or on behalf of an Insured."  Primary Policy, Managed Care Errors & Omissions Liability, § II.C (Ex. D).

39.     "Defense Expenses means reasonable and necessary legal fees and expenses incurred by the Company or the Insured, with the Company's consent, in

ME1 43920603v.1

the investigation, defense, settlement and appeal of a Claim; including but not limited to, cost of expert consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds (without the obligation to furnish such bonds) regarding such Claim; provided, that Defense Expenses will not include the salaries, wages, benefits or overhead of, or paid to, any Insured or any employee of such Insured." Primary Policy, Liability Coverage Terms and Conditions, § II.F (Ex. D).

40.     The Primary Policy also expressly provides coverage for an "Antitrust Claim." Primary Policy, Managed Care Errors & Omissions Liability, § II.A (Ex. D).

41.     "Antitrust Claim means any Claim based upon or arising out of any actual or alleged violation of any law, including any federal, state or local statute, rule, regulation or common law relating to antitrust, the prohibition of monopolies, activities in restraint of trade, unfair methods of competition or deceptive acts or practices in trade or commerce, including any actual or alleged violation of the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Federal Trade Commission Act, the Hart-Scott Rodino Antitrust Improvements Act, or any other rule or regulation promulgated thereunder." Primary Policy, Managed Care Errors & Omissions Liability, § II.A (Ex. D).

ME1 43920603v.1

42.     The Policy is triggered when the limits of the underlying primary E&O policy, issued by Travelers, and the first excess E&O policy issued by ACE, have been exhausted.  Policy, § I (Ex. C).

43.     The Policy provides that "if the Underwriter gives the Insured prior written consent, the Insured may pay a portion of loss that would otherwise be payable as covered loss by the issuer(s) of the Underlying insurance, provided, that:

> (1)     The Underwriter's obligation to pay covered loss under this Policy shall not exceed the amount stated in ITEM 3 of the Declarations multiplied by the lowest percentage that the covered loss paid by any financially solvent issuer of the Underlying Insurance bears to such issuer's limit of liability; and

> (2)     such Insured will provide the Underwriter with satisfactory evidence of the Insured's payment of such loss in legal currency."

Policy § I(C), as amended by Endorsement No. 6 (Ex. C).

44.     Capital BlueCross paid substantial premiums to purchase the Policy, and Capital BlueCross has complied with all applicable terms and conditions of the Policy.  Atlantic Specialty's breach of its obligations under the Policy has relieved Capital BlueCross of any further obligation to comply with the Policy terms and conditions.

## IV.   Capital BlueCross's Effort to Obtain Insurance Coverage from Atlantic Specialty

45.     The allegations of the Subscribers and Providers in the Alabama Antitrust Litigation fall squarely within the coverage afforded by the Policy.

46.     Capital BlueCross provided timely notice of the Alabama Antitrust Litigation to all of its insurers, including Atlantic Specialty, and demanded Atlantic Specialty provide coverage for the Alabama Antitrust Litigation.

47.     Atlantic Specialty did not issue a coverage position in response to Capital BlueCross's notice of the Alabama Antitrust Litigation.

48.     Throughout the course of the Alabama Antitrust Litigation, Atlantic Specialty repeatedly requested extensive, irrelevant, or privileged information from Capital BlueCross, much of which Atlantic Specialty was not entitled to under the Policy.

49.     Despite Atlantic's refusal to expressly accept or refuse coverage as it was required to do by law, and its unreasonable requests for information, Capital BlueCross kept Atlantic Specialty apprised of the status of the Alabama Antitrust Litigation and provided Atlantic Specialty with substantial information and frequent status updates, including, but not limited to:

> (a) Access to a secure portal housing several thousand documents, including written discovery requests and responses, a list of witnesses deposed, transcripts of depositions, deposition

exhibits, motions, memorandum of law and supporting exhibits, and PowerPoint presentations;

(b) Atlantic Specialty or its counsel were invited to participate in over 35 meetings or teleconferences with defense counsel for the Blue Defendants;

(c) Certain meetings or teleconferences were also attended by the mediator overseeing the mediation between the Blue Defendants and the Subscriber plaintiffs, and Atlantic Specialty and its counsel were invited to ask questions directly of the mediator; and

(d) Capital BlueCross has provided information concerning settlement negotiations, including drafts of the Subscriber settlement agreement, and defense counsel has considered requests, comments, or concerns raised by Atlantic Specialty.

50.     On July 30, 2019, Capital BlueCross and each of its insurers *except* Atlantic Specialty participated in a mediation session in an attempt to resolve the insurance coverage issues arising from the Alabama Antitrust Litigation.

51.     On May 3, 2019, Atlantic Specialty's counsel sent an email stating it would not be participating in the mediation, but did not provide any reason for Atlantic Specialty's refusal to participate.

ME1 43920603v.1

52.     Through significant effort during the mediation session and through discussions following the session, Capital BlueCross and all of its other insurers providing both E&O and D&O coverage, including Travelers, ACE, and AIG, entered into a confidential settlement regarding the other insurers' coverage obligations with respect to the Alabama Antitrust Litigation.

53.     Following five years of mediation with three mediators, and as Atlantic Specialty was well aware, the Blue Plans entered into a settlement agreement with the Subscribers for the resolution of the Subscriber track of the Alabama Antitrust Litigation which is currently pending court review and approval in the Northern District of Alabama.

54.     The Subscriber track settlement, if approved by the Alabama court, includes a $2.67 billion settlement fund, which the Subscribers describe as being "one of the largest monetary recoveries ever achieved in an antitrust class action settlement." Antitrust Litigation, Subscriber Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Proposed Class Settlement, ECF # 2601-1 at 2.

55.     After providing Atlantic Specialty with drafts of the proposed Settlement Agreement with the Subscribers, a copy of the proposed Settlement Agreement, and arranging for calls with defense counsel in the Alabama Antitrust Litigation to allow Atlantic Specialty, among others, to ask questions concerning

- 16 -

the Settlement Agreement, on August 24, 2020, Capital BlueCross requested Atlantic Specialty's consent to the terms of the Settlement Agreement with the Subscribers.

56.     Atlantic Specialty did not provide its consent to the Settlement Agreement and instead sent a letter on August 28, 2020, seeking extensive and burdensome additional information and demanding an immediate response before Atlantic Specialty would respond to Capital BlueCross's request for consent.

57.     Although Capital BlueCross responded to Atlantic Specialty's information requests, Atlantic Specialty still refused to provide its consent to the Settlement Agreement, and instead, on September 25, 2020, Atlantic Specialty agreed only that it would not raise lack of consent to settle as a coverage defense to the Settlement Agreement.

58.     Presently, there is no proposed settlement agreement with the Providers, and the Provider track continues to be litigated and mediated.

59.     On October 5, 2021, Atlantic Specialty denied coverage for the Provider track portion of the Alabama Antitrust Litigation. A copy of Atlantic Specialty's denial of coverage is attached hereto as Exhibit E.

60.     On April 29, 2022, Capital BlueCross responded to Atlantic Specialty's denial of coverage and requested it withdrawal its declination.  A copy

of Capital BlueCross's response to Atlantic Specialty's denial is attached hereto as Exhibit F.

61.    On June 10, 2022, Capital BlueCross followed up on its April 29, 2022 correspondence.  A copy of Capital BlueCross's June 10, 2022 letter is attached hereto as Exhibit G.

62.    On July 29, 2022, Atlantic Specialty reiterated its denial of coverage for the Provider track of the Alabama Antitrust Litigation.  A copy of Atlantic Specialty's July 29, 2022 letter is attached hereto as Exhibit H.

## COUNT I
## DECLARATORY JUDGMENT

63.    Capital BlueCross incorporates by reference the above allegations of this Amended Complaint and makes them a part hereof as if fully set forth at length herein.

64.    A substantial premium has been paid to Atlantic Specialty for coverage under the Policy, and Capital BlueCross has at all times complied with all relevant provisions of the policy.  Atlantic Specialty's breach of the Policy has relieved Capital BlueCross of any further obligations under the Policy.

65.    Atlantic Specialty contracted to pay Loss for a Claim for a Wrongful Act.

ME1 43920603v.1

66.     As explained above, a Wrongful Act is defined, in part, as "any actual or alleged act, error or omission in the performance of, or any failure to perform, a Managed Care Activity."

67.     The Alabama Antitrust Litigation contains numerous allegations that fall within the Policy's broad definition of a Managed Care Activity, triggering Atlantic Specialty's coverage obligations.[1]

68.     Despite this, Atlantic Specialty denied coverage for the Provider track of the Alabama Antitrust Litigation and fails to acknowledge its obligations to:  (a) fund Capital BlueCross's defense of the Alabama Antitrust Litigation; and (b) pay any judgment or settlement arising from the Alabama Antitrust Litigation.

69.     By reason of the foregoing, an actual and justiciable controversy exists between Capital BlueCross and Atlantic Specialty regarding their rights and obligations under the Policy.

70.     The rights, status and other legal obligations of Capital BlueCross and Atlantic  Specialty  remain  uncertain  and  insecure,  and  this  Court's  entry  of

---

[1] By way of example only, both the Provider plaintiffs and the Subscriber plaintiffs allege  the  use  of  "most  favored  nation"  provisions  between  the  Blue  Plans constitutes  anticompetitive  behavior.   *See*  Subscriber  Track  Fourth  Amended Consolidated Class Action Complaint, Ex. A at ¶ 513, and Fourth Amended Provider Complaint, Ex. B at ¶ 363.  These allegations fall squarely within the Policy's definition of Managed Care Activity, which includes, among other things, Provider Selection, Utilization Review, and establishing or maintaining health care networks.

ME1 43920603v.1

declaratory judgment will terminate the uncertainty and controversy giving rise to this proceeding.

**WHEREFORE**, Capital BlueCross respectfully requests that this Court issue a declaration that:

(a)    under the terms of the Policy, Atlantic Specialty has a duty to pay on behalf of Capital BlueCross defense and indemnity arising from the Alabama Antitrust Litigation within the limits of the Policy and in excess of underlying limits;

(b)    under the terms of the Policy, Atlantic Specialty has a duty to indemnify and reimburse Capital BlueCross for the fees, expenses, and costs Capital BlueCross will incur in defense of the Alabama Antitrust Litigation;

(c)    Atlantic Specialty must reimburse Capital BlueCross for fees, expenses and costs that it has incurred and will incur in bringing this insurance coverage action; and

(d)    such other relief as the Court deems appropriate.

## COUNT II
## BREACH OF CONTRACT

71.    Capital BlueCross incorporates by reference the above allegations of this Amended Complaint and makes them a part hereof as if fully set forth at length herein.

72.    Atlantic Specialty contracted to pay Loss incurred in connection with a Claim.

73.    Capital BlueCross has incurred, and continues to incur, Loss in the defense and resolution of the Alabama Antitrust Litigation.

74.     Capital BlueCross has fully performed any and all conditions required by the Policy, or such conditions have been waived by Atlantic Specialty.

75.     Capital BlueCross timely made a demand on Atlantic Specialty to acknowledge its obligations under the Policy and commit to funding a portion of the Settlement Agreement.

76.     Atlantic Specialty refuses to acknowledge its obligation to fund Capital BlueCross's defense and resolution of the Alabama Antitrust Litigation and has denied coverage for the Provider track of the Alabama Antitrust Litigation.

77.     Moreover, Capital BlueCross has settled its claims for coverage with all of its other insurers arising out of the defense and resolution of the Alabama Antitrust Litigation.

78.     Atlantic Specialty, however, (1) refused to participate in a mediation session with Capital BlueCross and its other insurers, (2) unreasonably withheld its consent to Capital BlueCross's participation in a settlement of the Subscriber track of the Alabama Antitrust Litigation; and (3) denied coverage for the Provider track of the Alabama Antitrust Litigation.

79.     Atlantic Specialty has breached its obligations under the Policy, depriving Capital BlueCross of the benefit of the insurance protection for which substantial premiums have been paid.

ME1 43920603v.1

**WHEREFORE,** Capital BlueCross demands judgment in its favor against Atlantic Specialty:

(a)   that the Policy provides coverage for the Alabama Antitrust Litigation;

(b)   for money damages, not limited to the Policy liability limits, as well as direct, compensatory and consequential damages, together with pre-judgment and post-judgment interest, arising from Atlantic Specialty's breach of the Policy;

(c)   for costs of suit; and

(d)   for such further relief the Court may deem just and proper.

## COUNT III
## ANTICIPATORY BREACH OF CONTRACT

80.    Capital BlueCross incorporates by reference the above allegations of this Amended Complaint and makes them a part hereof as if fully set forth at length herein.

81.    Atlantic Specialty contracted to pay Loss incurred in connection with a Claim.

82.     Capital BlueCross has incurred, and continues to incur, Loss in the defense and resolution of the Alabama Antitrust Litigation.

83.    Capital BlueCross has fully performed any and all conditions required by the Policy.

84.     Capital BlueCross timely made a demand on Atlantic Specialty to acknowledge its obligations under the Policy.

85.     Atlantic Specialty refuses to acknowledge its obligation to fund Capital BlueCross's defense and resolution of the Alabama Antitrust Litigation.

86.     Atlantic Specialty unreasonably refused to provide its consent to Capital BlueCross's participation in a settlement of the Subscriber track of the Alabama Antitrust Litigation.

87.     As a result, Capital BlueCross anticipates Atlantic Specialty will breach its obligations under the Policy by refusing to fund Capital BlueCross's defense expenses or a portion of the Settlement Agreement, depriving Capital BlueCross of the benefit of the insurance protection for which substantial premiums have been paid.

**WHEREFORE,** Capital BlueCross demands judgment in its favor against Atlantic Specialty:

(a)   that the Policy provides coverage for the Alabama Antitrust Litigation;

(b)   for money damages, not limited to the Policy liability limits, including direct, compensatory and consequential damages, together with pre-judgment and post-judgment interest, arising from Atlantic Specialty's anticipatory breach of the Policy;

(c)   for costs of suit; and

(d)   for such further relief the Court may deem just and proper.

- 23 -

## COUNT IV
## FOR DAMAGES RESULTING FROM ATLANTIC SPECIALTY'S BAD FAITH CONDUCT

88.     Capital BlueCross incorporates by reference the above allegations of this Amended Complaint and makes them a part hereof as if fully set forth at length herein.

89.     Pursuant to 42 Pa. C.S.A. § 8371 (the "Bad Faith Statute"), and Pennsylvania's Unfair Insurance Practices Act, 40 P.S. § 1171.4, et seq. ("UIPA"), Capital BlueCross is entitled to damages as a result of Atlantic Specialty's bad faith conduct towards Capital BlueCross.

90.     The Bad Faith Statute provides "[i]n any action arising under an insurance policy, if the court finds the insurer has acted in bad faith towards the insured, the court may take all of the following actions:" (1) award interest on the amount of the claim from the date the claim was made, (2) award punitive damages, and (3) assess court costs and attorney fees.

91.     An insurer is deemed to have acted in bad faith in violation of the Bad Faith Statute when the insured has no reasonable basis for its action and the insurer knew of or recklessly disregarded the fact that it lacked a reasonable basis for its actions.

92.     Insurer bad faith has been found to exist where, among other things, an insurer unreasonably denies coverage, engages in unnecessary or unfounded

- 24 -

investigation of a claim, fails to communicate with its policyholder, or fails to promptly act on a claim.

93.    Courts have also determined that violations of the UIPA may demonstrate the existence of bad faith under the Bad Faith Statute.

94.    The UIPA specifically prohibits an insurer from, among other things:

(a)    Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue;

(b)    Failing to acknowledge and act promptly upon written or oral communications with respect to claims arising under insurance policies;

(c)    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d)    Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e)    Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear;

(f)    Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such

persons; and

(g)   Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

95.   Atlantic Specialty's refusal to investigate promptly and adequately, and to commit to paying Capital BlueCross's defense costs or any judgment or settlement in the Alabama Antitrust Litigation, in violation of UIPA § 1171.5(a)(10)(iv), constitutes bad faith.

96.    Moreover, Atlantic Specialty's unnecessary, unfounded, and repeated information requests, including as recently as in response to Capital BlueCross's request for consent to the Subscriber settlement, constitute bad faith.

97.   Atlantic Specialty's using the pretext of a lack of information to refuse to consent to the Subscriber Settlement constitutes bad faith.

98.   Atlantic Specialty recklessly disregarded Capital BlueCross's claim for coverage for the Alabama Antitrust Litigation because, as explained above, the Alabama Antitrust Litigation alleges conduct that constitutes a Wrongful Act under the Policy, which is broadly defined to include "any actual or alleged act, error or omission in the performance of, or any failure to perform, a Managed Care Activity."

99.   Moreover, Atlantic Specialty recklessly disregarded its coverage

obligations for the Alabama Antitrust Litigation because the Policy follows form to a primary policy that expressly provides coverage for Antitrust Claims, and both the Subscriber and Provider plaintiffs allege various Antitrust Claims, including, but not limited to, violations of Section 1 and 2 of the Sherman Act.

100. The Alabama Antitrust Litigation contains a number of allegations that fall within the Policy's broad definition of a Managed Care Activity, triggering Atlantic Specialty's duty to acknowledge its coverage obligations.

101. As such, Atlantic Specialty acted in bad faith because it has recklessly disregarded that it has no reasonable basis to deny coverage and yet it still denied coverage for the Provider track of the Alabama Antitrust Litigation.

102. Atlantic Specialty's bad faith conduct is aimed at forcing Capital BlueCross to settle its coverage dispute with Atlantic Specialty for less than the amount to which Capital BlueCross is entitled.

103. In evaluating its obligations under the Policy, Atlantic Specialty has been less than honest, intelligent, and fair.

104. In evaluating its obligations under the Policy, Atlantic Specialty has failed to accord the interests of Capital BlueCross the same faithful consideration that it has given its own interests and has, instead, ignored the interests of Capital BlueCross.

105. In evaluating its obligations under the Policy, Atlantic Specialty has

failed to use the same degree of care and diligence as a person of ordinary care and prudence would exercise in the management of his own business.

106.   Atlantic Specialty has failed to perform its duty to read the Complaints in the Alabama Antitrust Litigation with all doubts as to whether the claim may fall within the coverage of the Policy resolved in favor of Capital BlueCross.

107.   Atlantic Specialty lacks a reasonable basis to deny coverage to Capital BlueCross and knew or recklessly disregarded its lack of a reasonable basis.

108.   Atlantic Specialty acted with ill will and/or an improper motivation.

109.   Atlantic Specialty's bad faith conduct includes, but is not limited to:

(a)   failing to adopt and implement standards for the proper investigation of claims, in violation of UIPA § 1171.5(a)(10)(iii), and instead engaging in harassing conduct to delay acknowledging its coverage obligations;

(b)   misrepresenting pertinent facts or insurance policy provisions related to coverages at issue, in violation of UIPA § 1171.5(a)(10)(i);

(c)   failing to acknowledge and act promptly upon communications with respect to claims, in violation of UIPA § 1171.5(a)(10)(ii), including, but not limited to, Capital BlueCross's request for

consent to the Subscriber settlement and failure to promptly provide Capital BlueCross with Atlantic Specialty's coverage position;

(d)    failing to clearly explain the nature of its repeated and extensive information requests and the reasons why such information is necessary to its evaluation of coverage;

(e)    continually seeking further and additional information, despite being provided with access to the information reasonably required to make payment under the Policy, including thousands of pages of documents, numerous meetings and teleconferences with defense counsel, and access to mediation sessions and court conferences, in an effort to delay and/or avoid payment;

(f)    failing in good faith to effectuate prompt, fair and equitable settlement of Capital BlueCross's claim once its liability became reasonably clear, in violation of UIPA § 1171.5(a)(10)(vi), despite every single one of Capital BlueCross's other insurers in both its E&O and D&O towers of coverage agreeing to engage in settlement discussions and reaching a resolution of their coverage obligations;

- 29 -

(g)     compelling Capital BlueCross to fund all or part of its covered Loss in connection with the Alabama Antitrust Litigation and to incur legal expenses associated with this litigation, in violation of UIPA § 1171.5(a)(10)(vii);

(h)     failing to provide a reasonable explanation of the basis, under the applicable facts or law, for its refusal to provide coverage, in violation of UIPA § 1171.5(a)(10)(xiv), including not providing Capital BlueCross with its coverage position and denying coverage for the Provider track of the Alabama Antitrust Litigation;

(i)     refusing to consent to the settlement of the Subscriber track of the Alabama Antitrust Litigation in response to Capital BlueCross's request on August 24, 2020 that it receive Atlantic Specialty's consent by August 28, 2020.

110.   Upon information and belief, Atlantic Specialty's bad faith conduct occurs with such frequency as to indicate a general business practice.

111.   Capital BlueCross has been harmed as a result of Atlantic Specialty's bad faith conduct.

**WHEREFORE**, Capital BlueCross respectfully requests that this Court:

(a)     Award Capital BlueCross compensatory, consequential and punitive damages resulting from Atlantic Specialty's bad faith

refusal to provide coverage for the Alabama Antitrust Litigation;

(b)   Assess court costs, attorneys' fees and interest against Atlantic Specialty;

(c)   Award Capital BlueCross the relief available under 42 Pa. C.S.A. § 8371, et seq.; and

(d)   Award Capital BlueCross such other relief as the Court deems appropriate.

### COUNT V
### FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

112.   Capital BlueCross incorporates by reference the above allegations of this Amended Complaint and makes them a part hereof as if fully set forth at length herein.

113.   Atlantic Specialty contracted to pay Loss incurred in connection with a Claim.

114.   Capital BlueCross has incurred, and continues to incur, Loss in the defense and resolution of the Alabama Antitrust Litigation.

115.   Capital BlueCross has fully performed any and all conditions required by the Policy.

116.   Capital BlueCross timely made a demand on Atlantic Specialty to acknowledge its obligations under the Policy and commit to funding a portion of the Settlement Agreement.

117. Atlantic Specialty frivolously and without reason refuses to acknowledge its obligation to fund Capital BlueCross's defense and resolution of the Alabama Antitrust Litigation.

118. Capital BlueCross also timely made a demand for coverage under the Policy for the Provider track of the Alabama Antitrust Litigation, which Atlantic Specialty denied.

119. Atlantic Specialty has not dealt with Capital BlueCross on a fair and frank basis and has not at all times discharged its duties in good faith.

120. Atlantic Specialty, in its claims handling practices, and particularly through its burdensome and unnecessary information requests, has not afforded Capital BlueCross's interests the same consideration as its own.

121. Moreover, Atlantic Specialty has not evaluated the Alabama Antitrust Litigation or its obligations under the Policy in an honest, intelligent, and objective manner.

122. Atlantic Specialty has refused to respond to Capital BlueCross's request for consent to settle the Subscriber track of the Antirust Litigation, thereby creating uncertainty as to how that settlement is to be funded.

123. Atlantic Specialty refused to participate in a mediation with Capital BlueCross's other insurers and failed to provide a reason for its refusal.

124.   Atlantic Specialty has made frivolous allegations that Capital BlueCross has failed to cooperate with Atlantic Specialty in an effort to fabricate a claim that Capital BlueCross has breached its obligations under the Policy.

125.   Upon information and belief, Atlantic Specialty has no intention of providing coverage for the Alabama Antitrust Litigation, yet has delayed issuing its coverage position so that it can continue to make unreasonable demands for information.

126.   Atlantic Specialty has breached its obligations under the Policy, depriving Capital BlueCross of the benefit of the insurance protection for which substantial premiums have been paid.

**WHEREFORE,** Capital BlueCross demands judgment in its favor against Atlantic Specialty:

(a)   that the Policy provides coverage for the Alabama Antitrust Litigation;

(b)   for money damages, not limited to the Policy liability limits, including direct, compensatory and consequential damages, together with pre-judgment and post-judgment interest, arising from Atlantic Specialty's breach of the Policy;

(c)   for costs of suit;

(d)   for counsel fees; and

(e)   for such further relief the Court may deem just and proper.

**JURY DEMAND**

- 33 -

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Attorneys for Plaintiff,
Capital BlueCross


By: *s/ Joann M. Lytle*
    Joann M. Lytle (PA 59281)
    Ashley L. Turner (PA 321816)
    MCCARTER & ENGLISH, LLP
    1600 Market Street, Suite 3900
    Philadelphia, PA 19103
    Phone: (215) 979-3800
    Fax: (215) 979-3899
    jlytle@mccarter.com
    aturner@mccarter.com

    and

    Peter J. Speaker (PA 42834)
    THOMAS, THOMAS & HAFER LLP
    P.O. Box 999
    Harrisburg, PA 17108
    Phone: (717) 255-7644
    Fax: (717) 237-7105
    pspeaker@tthlaw.com
    *Attorneys for Plaintiff Capital BlueCross*


Dated: January 20, 2023

ME1 43920603v.1